Our third case for this morning is Rodney Washington v. Boughton. Mr. Savignac Thank you, and may it please the Court. This case is a repeat of this Court's recent decisions in Amani v. Pollard and Tatum v. Foster. In both of those cases, this Court held that the Wisconsin courts had unreasonably applied Faret against California, the Supreme Court decision which clearly establishes that a criminal defendant has the right to represent himself at trial. Indeed, the State devotes the bulk of its argument on the Faret issue to arguing that Amani and Tatum are wrong, but those decisions are clearly correct. This Court should follow them here. So here's my question for you about that. In the earlier cases, we just had kind of a clean situation where the judge said, I don't think you know enough about, I'll just say the legal background, to represent yourself effectively, and purported to apply Wisconsin's classic rule, and we said no. Faretta very clearly says that whether you know the rules of evidence or whether you know about DNA or whatever isn't pertinent, fine. The State trial court seems to have made exactly the error that you're talking about. It seems to have said, this is going to be all about DNA evidence, you can't do this, so I'm going to force you to continue with this lawyer you don't like. By the time you get to the Wisconsin Court of Appeals, you have this discussion that mentions Mr. Washington's behavior in the courtroom, but brings it back to competence, and so not as a standalone. Now in this court, the State seems to have abandoned altogether the question about DNA knowledge, and is now saying, oh, you know, Mr. Washington was misbehaving, certainly a judge under Faretta doesn't have to allow that kind of person to represent himself. So where are we? Is the obstreperous behavior idea properly before us? What are we doing? So I would start with what the State court said. So you're right, the State appellate court, which is the court whose opinion really matters, its conclusion was that Mr. Washington was not competent to deal with the DNA evidence, but it gave two reasons for that. It concluded that it was reasonable for the trial court to think that he would not be able to properly focus on and understand the complicated DNA evidence. So the understand part, that's what the trial court said, which I think you agree was unreasonable. Well, that looks exactly like Imani. Yes, exactly. And then there's the focus on point. So the State appellate court said Mr. Washington had these very irrational ideas that he wanted to focus on. He thought the case should be about, you know, my State appointed counsel is in cahoots with the prosecution. This warrant in the case has been forged unlawfully, et cetera, and there's sort of a conspiracy against him. And his lawyer thought this case should be about fighting the prosecution's DNA evidence. I think that would probably have been very hard to do when you have that sort of DNA evidence against you, but the State appellate court took for granted that that was the best way of presenting the defense for Mr. Washington. So the State appellate court seemed to look at the record as a whole. I mean, are we required to stop right at the time he said, no, you can't represent yourself? And if so, whatever he might have done afterwards does not decide this. What he had done at that point, as I read it, is he had said, I filed something against you, judge. And he had done maybe one other thing, but he hadn't refused to come to court. He hadn't done a lot of the things that he did in the days following. So where is the point? That's right, Judge Bucklow. Most of the supposedly bad behavior that the State references and that the State appellate court seems to be talking about were things that happened after the denial of Mr. Washington's forever rights. And I think as a general rule, once your constitutional rights have been violated, which happened in this case when the trial judge said, no, I'm not going to let you represent yourself, your behavior after that happens doesn't retroactively validate that violation. I think the other thing was saying something about a stamp or he hadn't, it wasn't sealed. Yeah, I believe that what Mr. Washington argued was that the seal on the warrant had been forged and a warrant had been sort of backdated. I'm not exactly sure, but it's something along those lines. Both of those are somewhat predictive, I guess, of how this trial would have gone. But maybe we can't make that decision. So I agree that they were probably predictive of the fact that Mr. Washington had a view of his defense that focused on those things and not on the DNA to the extent that the State appellate lawyer would have thought. Well, I mean, to what extent are you making the argument that what we're looking for is the trial court's reason for denying the self-representation motion? And unless this trial court has abilities that most of us don't have, the reason couldn't rest on things that hadn't happened yet. He doesn't know that they're going to happen. So just as you would evaluate a warrant based on the information the police officers had at the time they applied, not on something they found out a week later. But I guess the State appellate court isn't drawing that line. I was concerned about the same thing Judge Bucklow was talking about. In fact, the trial court didn't actually give his behavior as a reason. That's right. The trial court did not refer to his, did not complain about his behavior. It certainly didn't suggest that it was one of the grounds for denying the Fretter request. And it hadn't been that bad as of that time. That's right. I mean, arguably, Mr. Washington became frustrated when his motions were denied and started acting out. If I could make this question a little harder for you, Mr. Savignac. Sorry. My concern here is that since we're dealing with AEDPA deference, I expect the State to say something along the lines of Fretter and other Supreme Court precedent do not foreclose the State courts from looking at post-denial behavior and looking at justifying this denial. Could you address it from that perspective? Well, I think it's, I guess there are two ways of looking at it. As Chief Judge Wood said, the trial judge couldn't see into the future. And when the State appellate court said, you know, on this record, it was reasonable for the trial judge to conclude that Mr. Washington shouldn't be allowed to represent himself, rationally it could only have been talking about the record leading up to that decision. The State hasn't argued that post-denial behavior can be considered in determining whether it was right to violate someone's constitutional right in the first place. It seems implicit in what they've said. Perhaps that's true. The State doesn't address basically what of the behavior, what parts of its narrative came before versus after the denial. But they do. Paragraph 33 in particular, the State appellate court's decision, is what I would say focusing on the merits of the arguments that Mr. Washington wants to make and how foolish those arguments are. And because they say leading up to his request to proceed pro se. So it seems to me to say that the State court is relying on something post-request is flatly inconsistent with what the State court says. And I would think the State itself can't rely on the post-request behavior. That's not what the State court did. The State court did, though, think that the kinds of things Mr. Washington was trying to raise were so off-base, irrational, obsessive, as they call it, that one legitimately could say, so as they summarize, his inability to recognize and follow proper courtroom decorum, very little evidence of that, or to identify and argue legitimate legal issues in his own defense, made it logical to conclude that he wouldn't be able to understand the DNA evidence. So that actually seems to have them coming all the way back to the DNA evidence in the end, which is the bad reason. Absolutely. They come back to the DNA evidence. And they basically are saying that Mr. Washington's arguments were bad. They were dumb arguments. The good argument was the DNA evidence. The fact that he focused on the bad arguments rather than the good ones shows that he wasn't competent, which, of course, is flatly inconsistent with Feretta in all of these cases, which I'll acknowledge. Of course, pro se defendants will usually make worse arguments than their lawyers would, and they're going to be worse off for going pro se in nearly every case. And they're not going to be asked to go pro se unless their lawyer is refusing to raise the issues they're concerned about. Exactly. This would rarely come up if you have a defendant who is very happy with his attorney's performance. Very true. So are you going to say anything about the other part of your case, the practice that Wisconsin seems to have of having indictments or criminal complaints, I should probably more say. It's a criminal complaint against ABC, and then seven years later say, well, actually what we mean by ABC is Rodney Washington. That seems to be the nature of the complaint they did, since they just described two modifications without saying what the gene on that location looked like. Sure. That's right. And my opening time is almost over, so I'm happy to rest on the briefs on that point, but I'm also happy to address any questions. I'd like to ask you when you think the due process claim became ripe. I think that the due process claim became ripe once you'd gone through the state courts presenting a state court argument and they had basically rejected it and thereby violated his federal right. If that's right, then a Bowie claim could never be subjected to procedural default, I suspect. But I'm concerned about, I would think that, I thought your position was that at least when the state court of appeals took this approach to the identification and the complaint, that that was the unpredictable and indefensible change in state law. And on the procedural default question, the issue seemed to me to be whether we should expect that issue to be raised either in rehearing or raised with the state Supreme Court. Sure. So our position is that it makes more sense, if you have a strong state law argument, to present it up through the state Supreme Court rather than say, rather than the formalistic requirement that a defendant say, you know, the court of appeals was wrong on state law, and by the way, state Supreme Court, if you agree with the court of appeals on state law, you're also violating my federal rights. So you would just say Bowie claims are excused from fair presentment issues? That's right, Your Honor. It would be basically futile to present the federal constitutional argument on top of the state argument. I'd like to reserve the balance of your time. Sure, that's fine. Thank you. Mr. LaRoy? May it please the court? I'd like to touch briefly on the warrant issue first, picking up where we left off, and then turn to the right to proceed pro se issue. So my friend says that his procedural default is excused because the claim is not ripe until direct review has ended. However, in the case Matrice v. Lancaster, it's a Supreme Court case, he cites in his reply brief on page 15. The Supreme Court did consider this type of due process claim on habeas review after the habeas petitioner had presented it to the state courts. The Supreme Court made no mention that he was raising an unripe claim, that the petitioner there was raising an unripe claim before the state courts in direct review. And so my friend's theory of the contours of the merits of this due process claim is simply incorrect. So for that reason, he has procedurally defaulted that claim. I found that whole system actually quite disturbing, and the distinctions between Dabney and this case to be very important. I can certainly see, in this day when you can watch TV ads for 23andMe, that if the actual DNA has been described, then the complaint is describing a particular person. But if all you say is that here are some gene locations, and you don't in any way provide anything that would identify this complaint as against one individual, except maybe some secret evidence locked away in a vault in the state somewhere, which strikes me as a star chamber kind of proceeding, it's a very troublesome procedure that Wisconsin seems to be following. Secret complaints is what you seem to think are fine for due process. So I have two responses. One, so it is a John Doe complaint, as our statutes plainly allow. They say that you don't have to have the name if you don't want to. If you have an identifier, though, in Dabney there were identifiers so that it was very clear in the public face of the complaint who was being accused. Maybe not by name. Sometimes people have aliases. Sometimes you don't know what the name is. But it was possible to identify the person, whereas that is not the case in this criminal complaint. This criminal complaint is just generic DNA locations, and the state says, oh, but we have other stuff somewhere else. But it's not in the complaint. I am very uncomfortable with the idea of a secret justice system that operates on the trust us, we're the state, we're going to do the right thing theory. Certainly. So push back a little bit. So the complaint does say it matches, and as Your Honor had mentioned. It doesn't say, it just says we have, I mean, it's in here in the appendix. It says matching at these locations, and I think the matching is. But it doesn't say anything about what it looks like. My DNA could match yours. Actually, my DNA could match my sister's at that location with that small number of locations, and people often do DNA testing on siblings. Right. So the point here is the provenance of the DNA, the source of the DNA is secure, and that hasn't been challenged here, and that's detailed in the complaint. But it's not in the complaint. There's nothing in the complaint that would allow a person to realize that's me. It's just unknown male with matching DNA at genetic locations, and then it lists six genetic locations. It doesn't say a word about what the gene is. If I could turn to Dabney, the case that my friend has said is the law in which we're judging the deviation from the standard. Dabney does say that identifying information extrinsic to the warrant is commonly needed. That's the quote, commonly needed, even when you have a non-DNA warrant. But understand, in Dabney, there was identifying information in the warrant, in the complaint. I'm very worried about the system that you're trying to construct in which there can be secret complaints. We're issuing a complaint against John Doe, who committed a sexual assault against somebody in the city of Chicago on January 10, 2018. Well, what does that tell you? It doesn't tell you anything, and if you can extend the statute of limitations that way. Is that what happened here? The Wisconsin appellate opinion seemed to say there really was one in 200 billion people that would match all of this. That's right, and that's in the warrant. Based on the DNA that was in the vault, and I'm not sure that's correct, if you think about siblings. If you only have six locations, they said that, and certainly if you had a full DNA profile of Person A, then I think the numbers that the Wisconsin Court of Appeals is talking about are the numbers I would expect to see. But six gene locations? So let me try and come at it this way. The complaint, excuse me, Dabney says that even if you appended the actual sequence of the genes, you can't just look at that and say, ah, yes, this is the person walking down the street. It's not the physical identifying information that we're commonly used to in complaints describing the name of the person, location, their physical description. And so just appending that to the complaint, I don't think it actually satisfies the legitimate concerns Your Honor is raising because you can't just look at it and say, yes, the state has dotted their I's and crossed their T's. But you could if you thought it was about you. Subscribe to 23andMe and find out if your DNA happened to match that. I'm not so sure you could, at least in the complaint here. So in the written decision, the circuit court denying post-conviction relief and then the transcript that accompanies that decision, that's in the record. They talk about the technology that they used to actually develop the DNA profiles in this case. And I believe Davis kind of mentions this a little bit. It talks about just like the level of technical difficulty you would need to have, that where you needed experienced technicians. So I don't think the 23andMe type technology was available in the 90s and early 2000s. No, it was. That's right. And so my whole point here is that if we're looking at Davis and Dabney, they established rules in which we judge from this case. And it's not such a clear departure that we can say it develops or it violates the due process clause. In particular, Davis says it rejects a particular argument that using new DNA technology to match the warrant later should defeat the warrant. And it says that would elevate form over substance. So that's the same type of thing here that I would argue, that the DNA is located in the data bank. The provenance is secure. The state says here it is. It's the one that matches. Requiring appending things, appending information that you can't actually use to identify someone on the street would be form over substance. What's the point of a complaint then, really? There is no point of a complaint. No, so I disagree. And the reason I disagree is because of this matching language and because the complaint says very clearly how they obtained the DNA. So there could be an independent audit that says, yes, the provenance is secure here. And I don't think anything necessarily, this hasn't been briefed, but I don't think anything necessarily forecloses someone saying, show me where the DNA is or let me test it once litigation, once a criminal prosecution has commenced. I'm not sure what procedures those would be, but I can imagine that actually happening. And so I don't think it is a sort of secret vault, star chamber-esque type of proceeding. Mr. Leroy, is Wisconsin still using the same method that was used here? And this was done before either Davis or Dabney. The crimes were committed before those cases were decided, right? And this complaint was filed before those cases were decided, right? That's right. This complaint was filed before those cases were decided. My friend has said that that is nevertheless the settled law here, so we've taken that as a concession and then judged our complaint against Davis and Dabney. I don't think we are using the same DNA type of technology in the Davis case in particular. But is Wisconsin still just saying, in essence, that a complaint simply says there's a human being with genes at these locations? Or is it providing more detail now? So I believe now it is providing more detail. And going back to the transcript on the hearing that then the circuit court made its post-conviction decision on, it mentions that even including the numbers that my friend had been talking about in there was not possible under the old DNA technology. So that's in that transcript. I don't think we are using the old technology before. Davis mentions that the state had a transitionary period where they were retesting with newer technology, and that's how the Davis case came out. And then in that same hearing transcript, the state mentions this type of DNA technology. The prosecutor actually had to refresh the memory of the DNA analyst to say, yes, we were using this back then, and these are the details of that. So that deals with the warrant issue. And so it's for the same reason for the ineffective assistance of counsel issue premised on that. It's just not the same type of deviation that we would expect. So on Ferretta, if we could turn to that, would you agree that the trial court's rationales were contrary to Ferretta, or at least unreasonable applications of it? So I disagree in this sense. The trial court rested it on competency. This court has said that Wisconsin... Understanding DNA evidence kind of competency, not saying that the man was mentally ill, not saying that he had an IQ of 65. Do you know a lot about DNA evidence? Right. That's right. So this court has essentially said that that type of approach is wrong. We challenged that in our briefs. I'll wrestle that in our briefs. I don't want to raise that here. However, it also laid the groundwork for a forfeiture type of finding based on obstructionist misconduct. In the trial court? The trial court did. Where? How? So, for example, this is all record 9-3. That's the habeas petition, and then it's quite a long page. He says at 197. It's actually not paginated. It's just a PDF document. And it says, he says, the trial court says, you can't obstruct the orderly procedure of the court or manipulate it in the way you are trying to do. Now, the trial court is wrapping up all of these sort of what we would call forfeiture fact findings into the competency rubric. And I think the best way to understand it is that... But he hasn't done anything terribly disruptive. As of the time the trial court tells him he's going to be forced to accept this lawyer. So, I disagree with that. And looking at just the pro se... I mean, I'm looking at the record, too. You can disagree if you want to, but he... I didn't see anything yet, Mr. Leroy, that is unusual for pro se litigants in general or even lawyers not familiar with courtroom practice. So, I'd like to... I'll run through what I think would justify the Court of Appeals essentially saying we have this obstructionist misconduct here. So, first, his request to go pro se, it's made on the day of trial. And as this court said in Imani, where a defendant invokes his right so late as to delay a trial, a judge may deny the exercise of right of self-presentation. Trial was, in fact, delayed, however, for the competency examination, et cetera. Trial was delayed because of his own behavior. He was essentially so obstructive in the trial that... Excuse me, in this pro se hearing that his own counsel thought that actually he might not even be competent to stand trial itself. And so, you would have to delay for that reason. However, we didn't have that information when he's making his pro se request the day of trial. So, the second thing is he's repeatedly... But he didn't say that he wasn't ready to go to trial, did he? I'm sorry? He didn't say he wasn't ready to go to trial. Most of those cases have to do with somebody on the day of trial saying, I want new counsel, maybe all of them. That's right. So, in Imani, he does say... Excuse me, in Imani, this court said where a defendant invokes the right to go pro se as to delay trial, then you can deny it. But actually, in this transcript, I think he does say, if I'm not ready, you should give me a delay. I think the defendant did say that in the pro se hearing. But the second thing is he's constantly disrupting and interrupting the court. He's also... He's calling the court your honor, and he apologizes, and he's trying to talk to the judge. I think... I respectfully disagree on this. So, here's a good line. He says, you're not going to put a loop... This is to the court. You're not going to put a loop around my neck like I'm some kind of dog and put me in the slaughterhouse. So, that's a disruption. Where is that? Yeah, where is all of this? So, this is just... This is at record 9-3. I believe I have the correct transcript. 9-3. This is on the PDF page of 208. And so, these are all attended to. I'm looking at a transcript of April 28th, 2008, which I thought was the... So, we have the original morning, April 28th hearing, and then they postpone, and then they have the afternoon. And that's the one where we have the cross-off, April 29th. And it's April 28th, and then it's erroneously crossed off. Yeah. Okay. So, I've got both of those. And those have pages on them. So, what page are you looking at? If I could. So, I was giving the PDF pages as opposed to the actual transcripts that are just in the state court record. This is out of the district court record. Okay. Well, while you're looking for it, I'll just say, at least my own look at the record suggests that he was... He may not have been the most polite person in the world, but frankly, I've seen lawyers with worse manners than that. And he largely acquiesces to what the judge is doing. As soon as his request is denied, he does become disruptive and rude and, you know, fails to comply with courtroom decorum. But it really seems to me that until that motion is denied, he's trying to communicate why it is he wants to go by himself. I do not recall that he says, I have to have more time, and it's going to change the schedule. And the judges just keep going back to this idea that he just isn't savvy enough to be able to do this. He doesn't know about DNA. He's got this crazy theory about the seal and so on. But those kinds of things are pretty easy for a court to deal with. You can just say, I'm not going to entertain any more discussion of that. And if he had been representing himself, the counterfactual that we don't know anything about, it may have gone fine. So if I could give the record, and then I'll respond to your question. So it's on. So it's docket item 9-3 before this court. So within that is the transcript. It says jury trial, but they had to delay the jury. So it's record number 58 from the actual state court proceeding. And then in the actual transcript, the state court transcript, page 30, Mr. Washington says, you're not going to push him on me. You're not going to team up with me and do me like a dog. You're not going to do it. I'm not going to let it happen. And so here what we have is we have Mr. Washington preventing the court from proceeding to trial. And I think the court can legitimate that. He's very frustrated. That's long after he's been denied. That's long after he's been denied. Again, you're trying to rely on this post-denial behavior as a reason for the denial. And he hadn't done it yet. That's not why the judge turned him down. So I'll say this. In the denial hearing, in the transcript, the judge is constantly going back and explaining his reasons. And so he does say early on, no, I'm not going to do it based on competency. Rest on that in our briefs on that issue. But he's also explaining as we're going on, as these disruptions are continuing. And I think that's what the Court of Appeals is latching onto. And I think that's allowed, the court should be allowed, the state court should be allowed to look at that. And the reason why is because in Brock, the court, there we had a pro se defendant. He's engaging in lots of misconduct. The court says, yes, Feretta says trial misconduct, it justifies forfeiture. But we're going to look at what's going on pretrial and project as you would have acted at trial. And that's allowed. And I think the state court is allowed to make the same kind of projection here. Okay. My concern is that that argument just seems to reverse the direction of time. So I understand the court's concern. I respectfully disagree with that because of Brock.  Okay. Thank you, Your Honor. All right. Thank you very much, Mr. Leroy. Anything further, Mr. Savignac? Very briefly, Your Honor. My friend has mentioned the idea that Mr. Washington has to go pro se on the day of trial. And he mentioned that in his last response to the 28J letter as well. It's a fact that's been mentioned before, but it's not an argument that anyone has ever made that he was somehow delaying the trial by waiting so long. So I do think that that's forfeited. As I think Judge Hamilton said, the trial was actually ultimately delayed for unrelated reasons anyway, so it wasn't really the day of trial. There's no evidence that allowing Mr. Washington to go pro se would have delayed the trial. The judge didn't say, I'm not allowing this because you would need more time to prepare. Mr. Washington didn't say, I need more time to prepare, so please delay the trial. Later he said in passing something like, well, you know, if I'm not ready to do this, I would ask that you replace my lawyer with someone else. That's sort of an equivocal comment, and it was after the denial at any rate. And then my friend refers to the Brock case. The Brock case says that pretrial disruption could justify terminating Feretta rights, and I don't disagree with that at all. But Brock was a case where Brock was allowed to go pro se, and then he was disruptive at pretrial hearings. Brock doesn't at all stand for the proposition that the state needs here, which is that a defendant's conduct after his Feretta right is denied, when he's not being allowed to represent himself, and he's mad about that, understandably, since his fundamental right was denied. That that could be relevant to whether the denial was the right thing to do in the first place. And if there are no further questions, I would ask that this court reverse. All right, thank you very much. And we appointed you, as I recall. We appreciate your help to the court, to your client. Thanks as well to the state. We will take the case under advisement.